In the Matter of the Complaint of **FARRELL LINES INCORPORATED**, Owner of the **STEAMSHIP AFRICAN NEPTUNE**, for limitation of liability.

**Civ. A. No. 3033.**

United States District Court,
S. D. Georgia,
Savannah Division.

June 13, 1974.

On Petition for Limitation of Liability
July 30, 1974.

Julian C. Sipple, Gustave R. Dubus, III (Chamlee, Dubus & Sipple), Savannah, Ga., Richard H. Brown, Jr. (Kirlin, Campbell & Keating), New York City, for Farrell Lines Inc.

David B. Kaplan, Boston, Mass., Leon A. Wilson, II and Benjamin Smith, Jr., Waycross, Ga., J. S. Hutto & Associates, Brunswick, Ga., Perry Brannen, Jr., Savannah, Ga., Richard E. Deane, Jacksonville, Fla., A. Blenn Taylor, Jr., Brunswick, Ga., Barnard M. Portman (Smith & Portman), Savannah, Ga., J. Richard Moore, Jacksonville, Fla., for claimants.

LAWRENCE, Chief Judge.

On the evening of November 7, 1972, the S.S. "African Neptune" while proceeding down the Brunswick River eastward toward the Atlantic Ocean struck the Sidney Lanier Bridge in Glynn County, Georgia. Ten occupants of vehicles awaiting her passage through the draw span were killed when three sections were knocked from the piers into the river.

In a subsequent proceeding by the owner of the "African Neptune" for limitation of liability, claims for wrongful death were filed by the personal repre-

sentatives of the decedents. Exoneration from liability has been denied by this Court.

What measure of damage is to be applied in determining the value of the lives of the ten deceased persons?

That question comes before this Court prior to decision on the limitation of liability issue and before the trial of the death and injury claims. Advance resolution of the issue as to elements of recovery will be helpful in permitting evaluation of the claims for purposes of possible settlement.[1] There has been oral argument and briefs have been filed. Counsel for some of the defendants urge the Court not to decide the question of the measure of damage at this stage but to withhold judgment until the trial of the death claims. I do not think that such a course will help matters in this case. My current views as to the law about damages can, if necessary, be changed to accord with subsequent rulings by the Fifth Circuit or the Supreme Court.

The measure-of-damages question is largely disposed of by Moragne v. States Marine Lines, Inc., 398 U.S. 375, 90 S. Ct. 1772, 26 L.Ed.2d 339 and Sea-Land Services, Inc. v. Gaudet, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9. The Fifth Circuit offspring of *Moragne* include Hornsby v. The Fish Meal Company, 431 F.2d 865; Dennis v. Central Gulf Steamship Corporation, 453 F.2d 137; Futch v. Midland Enterprises, Inc., 471

F.2d 1195; Petition of Canal Barge Company, Inc. as Owner and Operator of the M/V Elaine Jones, 480 F.2d 11 and Weeks v. Alonzo Cothron, Inc., 493 F.2d 538. These decisions set forth the elements and the measure of damages applicable to the judicially-created remedy for wrongful death under general maritime law. They enunciate the following principles and standards:

(A) An action can be maintained under general maritime law for wrongful death occurring in state territorial waters. *Moragne*, overruling The Harrisburg, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358.[2]

(B) The recognition of the right of such an action assures vindication of uniformity in the exercise of the admiralty jurisdiction, "removing the tensions and discrepancies that have resulted from the necessity to accommodate state remedial statutes to exclusively maritime substantive concepts." *Moragne*, at 401.

(C) In identifying the damages recognized by maritime law in the case of wrongful death, admiralty courts possess analogies for guidance in the Death on the High Seas Act, the Jones Act, the Longshoremen's and Harbor Workers' Act and state wrongful death statutes. See *Moragne*, at 406–408;[3] Petition of M/V Elaine Jones, *supra*, 480 F.2d at 30.

(D) The cause of action for wrongful death in admiralty is "not de-

---

1. See In Re Complaint of American Commercial Lines, Inc., as Owner of the Motor Vessel James L. Hamilton, 366 F.Supp. 134 (E.D., Ky.). In that case it was suggested to the district judge that the resolution of the question of whether the Kentucky Wrongful Death statute or the general maritime law controlled the measure of recovery would facilitate settlement discussions. See Insurance Counsel Journal, April, 1974, pp. 160–161.

2. "From the date of *The Harrisburg* until 1920, there was no remedy for death on the high seas caused by breach of one of the duties imposed by federal maritime law. For deaths within state territorial waters, the federal law accommodated the humane poli-

cies of state wrongful-death statutes by allowing recovery whenever an applicable state statute favored such recovery." *Moragne*, at 393. For a discussion of pre-*Moragne* law, see the case note in 49 North Carolina Law R. (February, 1971), 329–337.

3. Counsel for certain claimants argue that *Moragne* does not preclude the application of the State remedy. Support for such contention is found in Dennis v. Central Gulf Steamship Corporation, *supra*, 453 F.2d at 140. See also Greene v. Vantage Steamship Corporation, 466 F.2d 159 (4th Cir.); Spiller v. Lowe, 466 F.2d 903, 909 (8th Cir.). I return to this subject later in this pretrial Order.

pendent on adjacent state law". Hornsby v. The Fish Meal Company, *supra*.

■ (E) Survivors may recover damages for loss of support, services, and society of the deceased and funeral expenses. Loss of support includes all the financial contributions the decedent would have made to his dependents had he lived and the monetary value of services he would have provided in the way of nurture, education and guidance his child or children would have received had he not been wrongfully killed. *Gaudet*, at 585.

■ (F) Services performed for a spouse are remunerable. See *Gaudet*, at 585. A widow may be compensated for the reasonable cost of having someone else perform the household tasks her husband would have performed if he had lived. In the Matter of the Complaint of Sincere Navigation Corporation, as Owner of the S/S Helena, 329 F.Supp. 652, 659 (E.D., La.).

■ (G) The general maritime law as applied in post-*Moragne* death claims does not look merely to pecuniary loss. See Weeks v. Alonzo Cothron, Inc., *supra*, 493 F.2d at 542. Prior to *Gaudet* it was held in some jurisdictions that the general maritime law as applied to wrongful death actions does not recognize loss of consortium as an element of damage. See Petition of M/V Elaine Jones, *supra*, 480 F.2d at 31; Petition

of United States Steel Corporation, 436 F.2d 1256, 1278 (6th Cir.); Green v. Ross, 338 F.Supp. 365 (S.D., Fla.); Simpson v. Knutsen, 444 F.2d 523 (9th Cir.). In *Gaudet* (note 23) the Supreme Court disapproved that part of Petition of United States Steel Corporation and Simpson v. Knutsen holding that loss of consortium is not a proper element of damage.

■ (H) The Supreme Court sanctioned in *Gaudet* the recovery under general maritime law for "loss of society", which, it said, "embraces a broad range of mutual benefits each family member received from the other's continued existence, including love, affection, care, attention, companionship, comfort and protection".[4] It ruled that the loss of such benefits is the subject of just compensation. In Weeks v. Alonzo Cothron, Inc., *supra*, 493 F.2d at 542–543 the Fifth Circuit indicated that evidence as to "quantifiable 'pecuniary' value" of loss of nurture and guidance was unnecessary. It said (543) that "The District Court should permit proof to be offered on the issue of monetary value of the children's loss of nurture and guidance, *if, in the view of the District Judge, such evidence is necessary.*"[5] (Italics supplied).

■ (I) Before *Gaudet*, the Fifth Circuit had held that under general maritime law recovery for wrongful death

---

4. *Gaudet* went up from the Fifth Circuit. The Circuit Court had ruled that loss to beneficiaries for wrongful death included "loss of support, loss of services (including society, care, and attention), loss of love and affection, grief or mental suffering of the survivors, and funeral expenses". See 463 F.2d 1331 at 1332–1333. The affirmance by the Supreme Court would seem to nullify prior Fifth Circuit decisions as to the non-recoverability of damages for loss of "love and affection". See Kaiser v. Travelers Insurance Company, 487 F.2d 1300 (5th Cir.), petition for rehearing granted, 496 F.2d 531; Hueschen v. Fluor Ocean Services, Inc., 483 F.2d 1396 (5th Cir.). Those cases apparently equated "love and affection" with "survivors' grief".

5. In establishing the right to recover damages for loss of society, it is said that the

elements of proof include: "(1) Relationship of husband and wife, or of parent and child (or similar relationship between collateral relatives); (2) Continuous living together of parties at and prior to time of wrongful death; (3) Lack of absence of deceased or beneficiary for extended periods of time; (4) Harmonious marital or family relations; (5) Common interest in hobbies, scholarship, art, religion, or social activities; (6) Participation of deceased in family activities; (7) Disposition and habit of deceased to tender aid, solace and comfort when required; (8) Ability and habit of deceased to render advice and assistance in financial matters, business activities, and the like." See S. Speiser, Recovery for Wrongful Death, § 3.-45, p. 223.

does not include the element of "grief" of the family for the loss of a loved one. Canal Barge Company, Inc. v. Griffith, *supra*; Petition of M/V Elaine Jones, *supra*, 480 F.2d at 33–34; Hueschen v. Fluor Ocean Services, Inc., *supra*. The Supreme Court said in *Gaudet* that mental anguish or grief is distinguishable from loss of society and is not compensable under the maritime wrongful death remedy. See *Gaudet*, note 17.

■ (J) In determining the pecuniary earnings of a decedent, his estimated personal expenses had he lived must be ascertained and deducted. In Re Sincere Navigation Corporation, *supra*, 329 F.Supp. at 659.

■ (K) Future earnings of the decedent must be reduced to present cash value at a reasonable interest rate over decedent's remaining anticipated worklife. Petition of M/V Elaine Jones, *supra*, 480 F.2d at 29; Higginbotham v. Mobil Oil Corporation, 360 F.Supp. 1140 (W.D., La.); Weeks v. Alonzo Cothron, Inc., *supra*, 493 F.2d 538; Johnson v. Penrod Drilling Company, 469 F.2d 897, 903–904 (5th Cir.).

■ (L) No deduction for income taxes should be made in an award for loss of future earnings where the annual estimated earnings are not clearly above the reach of the middle income scale. Petition of M/V Elaine Jones, *supra*, at 28.

(M) In *Higginbotham, supra,* 360 F. Supp. 1140 the District Court did not take into consideration the decreasing purchasing power of the dollar, stating (at 1150) that such an additional award should await the *en banc* outcome in Johnson v. Penrod Drilling Co., *supra*. There a panel of the Court of Appeals for this Circuit held that the trial court should not take into account "future inflationary or deflationary trends in computing future lost earnings". I am in-formed that Johnson v. Penrod was argued *en banc* last October. No decision has been rendered up to now.

■ (N) Award of prejudgment interest is in the discretion of the district court. Weeks v. Alonzo Cothron, Inc., *supra*; Higginbotham v. Mobil Oil Corp. *supra*, at 1150.

■ (O) *Moragne* did not deal with the question of proper parties and beneficiaries. The Supreme Court observed, however, (at 406–407) that courts should look for guidance to the various wrongful death statutes enacted by Congress. Under the Death on the High Seas Act the action shall be brought by the personal representative "for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative".[6] 46 U.S.C. § 761. The rule that has been established under the general maritime law is that the suit shall be instituted by the personal representative for the benefit of the eligible beneficiaries. Green v. Ross, *supra*, 338 F. Supp. 365; Futch v. Midland Enterprises, Inc., *supra*, 471 F.2d 1195. In the present case the claimant is in each instance the personal representative of the deceased.

(P) The federal wrongful death statutes predicate compensation on pecuniary loss to the beneficiaries. See, for example, 46 U.S.C. § 762 (DOHSA); 16 ALR Fed. 679 et seq., § 4. Recovery under general maritime law is more liberal than under those statutes since the elements of compensation as established by the decisions include loss of society and companionship which is non-pecuniary in nature. Up to now, the decisions applying *Moragne* standards do not deal with the measure of damage in the case of death of children of tender years. Several such claims exist in the instant case. Anything I say on that subject at this point is necessarily tentative. My

---

6. The Federal Employers' Liability Act which is incorporated by reference in the Jones Act allows damages "in case of the death of such employee, to his or her personal representative, for the benefit of the surviving widow or husband and children . . . and, if none, then of such employee's parents; and, if none, then of the next of kin dependent on such employee. . . ." 45 U.S.C. § 51.

present impression is that loss of services of the child to majority may be compensated for and that damages can be awarded for deprivation of the child's society, companionship, love and affection during the life expectancy of the parents. See in this connection Dugas v. National Aircraft Corporation, 438 F.2d 1386 (3rd Cir.) which was an action under DOHSA.

(Q) There are two or three instances in the "African Neptune" litigation where a parent and a child were simultaneously killed as a result of the collision. Can the personal representative of the deceased child recover for the parent's death and vice-versa? I cannot answer that question in the absence of research and argument. In connection with the problem, see 25A C.J.S. Death § 40, p. 696; 22 Am.Jur.2d Death § 70, p. 654.

## II

The attorneys for the claimants insist that the elements and the measure of damages should be and are governed by the Georgia Wrongful Death Act. *Moragne* recognizes, they say, both the federal experience in the maritime area and the state experience via the numerous state wrongful death statutes and that no federal policy as to uniformity under the general maritime law prohibits the full application of the remedies provided under the Georgia Act. The standard of recovery under that statute is "the full value of the life of the decedent" to *himself* rather than to the survivors. See Atlantic, Valdosta and Western Railroad Company v. McDilda, 125 Ga. 468, 471, 54 S.E. 140. The definition of "full value" excludes any deduction for "necessary or other personal expenses of the

decedent had he lived". Ga.Code Ann. § 105–1308.

Counsel for some of the claimants assert that the Georgia Act must be applied since the collision involves a bridge over territorial waters of this State and the death of occupants of motor vehicles using the same. They rely on The Tungus v. Skovgaard, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524. To my way of thinking, *Moragne* administered to that case all but the final rites.[7]

However, the real burden of claimants' argument is that neither *Moragne* nor *Gaudet* abrogate the wrongful death remedy afforded by state law and that the Supreme Court has, in fact, said that the remedy for the newly-created right under general maritime law may and should look to state law as to the remedy and measure of recovery in death cases. There is support for this contention in Dennis v. Central Gulf Steamship Corporation, *supra*, 453 F.2d at 140. There the Fifth Circuit said that federal courts "may look to state law and adopt it as the general maritime law if it is not inimical to the maritime law."[8] Counsel also rely on Greene v. Vantage Steamship Corporation, 466 F.2d 159 which concurs with what was said in *Dennis*. In that case the Fourth Circuit held that "The doctrine of uniformity, as a constitutional doctrine, is inapplicable to the issue of damages under *Moragne*." Legal writers who recognize that a conflict had developed over "whether or not a State survival statute can continue to be applied in admiralty" characterize the language in *Dennis* as "confusing".[9] Much water has flowed beneath the Sidney Lanier Bridge since that case was decided two and a half

7. See *Dennis, supra*, 323 F.Supp. 943 at 947; Sennett v. Shell Oil Company, 325 F.Supp. 1, 8 (E.D., La.); *Moragne*, at 378–380, note 1; George and Moore, "Wrongful Death and Survival Actions under the General Maritime Law: Pre-Harrisburg Through Post-Moragne", 4 Jour. of Maritime Law and Commerce (Oct., 1972), 14.

8. In *Dennis* the Fifth Circuit recognized the "uniformity" mandate of *Moragne*. Actually, what the Court did was to extend the federal maritime right of recovery in death cases

to conscious pain and suffering of the decedent on the theory of *analogy* to such right in state statutes and not because they represent the law bound to be applied. This becomes the clearer under Petition of M/V Elaine Jones, *supra*, 480 F.2d 30–31 where such an award was sustained.

9. George and Moore, "Wrongful Death and Survival Actions under the General Maritime Law", *supra*, at 15. See also Higginbotham v. Mobil Oil Corporation, 357 F.Supp. 1164, 1175 (W.D., La.).

years ago. *Gaudet* appeared two years later and a number of other decisions have helped fill the interstices of the new maritime death remedy. In the interval a considerable body of *uniform* federal decisional law has evolved as to the elements of damages in wrongful death actions. As early as October, 1972, it could be said that "as there is no longer a void in the maritime law in death cases, there is no need for the application of State statutes as Federal law now provides both the right and the remedy which under the supremacy clause of the Constitution should preempt state law." See 4 Jour. of Maritime Law and Commerce, 15.

The decisions almost without exception are in the direction of uniformity and general application of the rules the federal courts lay down in respect to standards and elements of recovery in *Moragne*-type cases. Counsel are familiar with the district court decisions in this Circuit in Dennis v. Central Gulf Steamship Corporation, 323 F.Supp. 943, 949–950 (E.D., La.); In Re Sincere Navigation Corporation, *supra*, 329 F. Supp. at 661, and Higginbotham v. Mobil Oil Corporation, *supra*, 360 F.Supp. 1140, 1144–1148 (W.D., La.). In awarding damages the trial judges enumerated the elements of recovery and made separate awards of damages to the widow and children of the decedent. The approach to the problem was the same in each instance. *Moragne-Gaudet* standards were followed, not the Louisiana wrongful death statute.[10]

I do not see the virtues or magic in the Georgia Act that somehow demand that it be singled out as an exception to general maritime law standards in death cases. Apparently, claimants' counsel perceive qualities in the Georgia statute, unlike other survival laws, that transform it into controlling law where the wrongful death occurs in the waters of this State.

In any event, the Georgia Act appears to be "inimical" to the uniform standards desired under general maritime law in that it is punitive in respect to non-deduction of necessary expenses of decedent had he lived. Har-Pen Truck Lines, Inc. v. Mills, 378 F.2d 705 (5th Cir.); Collins v. McPherson, 91 Ga.App. 347, 351, 85 S.E.2d 552.

The standards of recovery under general maritime law are now pretty well established in wrongful death cases. The decisional trend reflects a liberal approach by courts in the application of the principles enunciated in *Moragne*. Areas remain in which the law is confused or unsettled. It is a fast-developing field and what is now murky may become lucent before the trial of the death claims in this case. But the basic governing standards admit of little doubt.

■ This Court will apply in the "African Neptune" claims the standards of recovery developed in the Fifth Circuit under the decisions in *Moragne* and *Gaudet*.[11]

## ON PETITION FOR LIMITATION OF LIABILITY

### Findings of Fact and Conclusions of Law

On July 11, 1974, the evidence presented in the matter of the petition for limitation of liability by Farrell Lines Incorporated as owner of the ocean-going steamship "African Neptune" was completed. After oral argument but without filing of briefs, this Court ruled from the bench that Petitioner had not established lack of privity or knowledge in the collision (or allision) at 9:59 P.M. on November 7, 1972, of the S.S. "African

---

10. Conditional awards were made for an element of damage which later proved not to be recoverable under general maritime law. In Sincere Navigation Corporation, *supra*, damages were given for "emotional distress" and "survivor's grief". See case note, "In re Sincere Navigation Corp.", in 70 Mich.L. R. (March, 1972), 757, 765.

11. In a paper delivered at a Seminar on admiralty law at Atlanta in June, 1974, Judge Alvin B. Rubin of the Eastern District of Louisiana dealt with the elements and measure of damages under the general maritime law. Rubin, "Death and Damages: What Course Do We Take from Moragne and Gaudet"?

Neptune" with the Sidney Lanier Bridge at Brunswick, Georgia.[1]

In the ruling from the bench, this Court found that the collision was the result of the navigational error that occurred when an order to the helmsman directing a 20 degree left rudder was erroneously executed by turning the wheel toward the right. I concluded that in taking the "African Neptune" out of Brunswick on the night of the collision, inadequate procedures and safeguards were employed to eliminate the results of human error in passage through the lift span opening in the Bridge. I further found that there was privity or knowledge on the part of Farrell Lines Incorporated.

This Court now enters Findings of Fact and Conclusions of Law formalizing and, in some instances, elaborating on its oral rulings and findings.

## I. *Findings of Fact*

(1) The preponderating cause of the collision with the Sidney Lanier Bridge was the navigational error that occurred when the order by the pilot to the helmsman for a 20 degree left rudder was wrongly executed by being responded to with a right rudder.

(2) The procedures used by the owner and those in command of the "African Neptune" on the night of the collision were inadequate and did not include "fail safe" precautions assuring avoidance of the collision with the Sidney Lanier Bridge.

(3) Petitioner failed to properly establish and oversee regulations and procedures looking to safe navigation of the vessel in approaching the opening in the Bridge.

(4) The error of the helmsman in responding to the proper order from the pilot was not detected by those on the bridge of the "African Neptune" until it was too late to avert a collision.

(5) Under the conditions existing in Brunswick Harbor, the port movement in order to transit the opening in the Sidney Lanier Bridge is not made until the vessel reaches a distance of around a ship-and-a-half length from the opening, approximately 860 feet.

(6) If a helmsman errs in carrying out an order, there is little likelihood of correcting the movement of the vessel in time to avoid a collision unless such error is immediately detected and rectified. Otherwise, the ship is on an irremeable course to collision and disaster.[2] The critical port movement represents a "point of no return" in event of a helmsman's error.

(7) Reversing the engine and dropping the port and starboard anchors did not suffice to arrest the vessel's headway before striking the bridge approximately 250 feet south of the southernmost lift span tower.

(8) The helmsman's error was detected by the Third Mate about six seconds after it occurred. The rudder is large and heavy and the machinery does not change the angle immediately. Before the rudder reached amidships six more seconds elapsed. Another thirteen seconds passed before the rudder reached a hard port position.[3]

(9) The failure to prevent or detect the mistake of the helmsman could have been avoided by adoption and use of proper procedures in the approach of the vessel to the Bridge.

(10) A high degree of care is demanded in the approach to and clearance of the Bridge. It is not a routine operation.

---

1. As to the making of oral findings at the completion of a trial in an admiralty case, see Movible Offshore, Inc. v. The M/V Wilken A. Falgout et al., Gulf and South American Steamship Co., Inc., 471 F.2d 268 (5th Cir.). Briefs had been submitted in the present case by both sides in connection with Claimants' motion for summary judgment as to denial of limitation which was filed after lengthy discovery in the case.

Hearings on that issue were held on September 7, 1973; January 21; April 1–3; June 13; July 10–11, 1974.

2. There were ten fatalities, more than ten injuries to persons, and approximately one million dollars damage to the Bridge.

3. Deposition of Donald L. Rominger, pp. 69–70.

(11) Shortcomings in the procedures employed included:

(a) insufficient personnel on the bridge of the vessel to insure proper helmsmanship;

(b) failure of those stationed on the bridge to make certain that the pilot's instruction to the helmsman was properly carried out;

(c) the duty delegated to the Watch Officer of keeping the bell log book prevented full attention to overseeing correct execution of the pilot's order to the helmsman.

(d) the position of the rudder angle indicator on the pilot house bulkhead on the bridge of the ship which did not conveniently permit prompt detection of the helmsman's error;

(e) the failure of the master prior to the vessel's departure from the dock at Brunswick to coordinate procedures and understandings with all concerned in respect to the approach of the "African Neptune" to the Sidney Lanier Bridge and transit thereof.[4]

(12) The shipowner had knowledge before the "African Neptune" left Brunswick of the procedures used by its vessels in approaching and going through the clearance in the Bridge. It failed to establish and enforce rules of safety which would have minimized or prevented the danger of a collision.

(13) The Court makes no findings as to the privity or knowledge of Farrell Lines Incorporated in respect to the failure to use tug assistance; to turn the vessel around further upstream so as to align her on a *straight* course to the bridge opening in the outbound movement; the lightness of the vessel (about 50% of cargo capacity) with resulting exposure of part of the rudder above water (approximately 26½ percent of its entire surface area); and the vessel's speed (7 or 8 knots). However, lack of ballast and the speed required for safely clearing the lift span opening were factors that might have been considered in the adoption of procedures and safeguards for proper navigation of the "African Neptune" prior to her departure from Brunswick.

## II. *Conclusions of Law*

1. In a proceeding for limitation of liability under 46 U.S.C. §§ 183, 196, the shipowner has the burden of proving lack of "privity or knowledge". Coryell v. Phipps, 317 U.S. 406, 409, 63 S.Ct. 291, 87 L.Ed. 363; Petition of Long, D. C., 295 F.Supp. 857, aff'd 439 F.2d 109 (2nd Cir.); China Union Lines, Ltd. v. Andersen & Co., 364 F.2d 769, 787 (5th Cir.), cert. den. 386 U.S. 933, 87 S.Ct. 955, 17 L.Ed.2d 805; Terracciano v. McAlinden Construction Co., 485 F.2d 304 (2nd Cir.).

2. "With the duty to make inquiry 'the measure' of the knowledge 'is not what the owner knows, but what he is charged with finding out.' Great Atlantic & Pacific Tea Co. v. Brasileiro, 2 Cir., 1947, 159 F.2d 661, 665, 1947 AMC 306. For '. . . knowledge means not only personal cognizance but also the means of knowledge—of which the owner or his superintendant is bound to avail himself—of contemplated loss or condition likely to produce or contribute

4. In a statement to a Coast Guard investigator on the day following the collision the Third Mate, Donald L. Rominger, described the confusion on the bridge of the "African Neptune" on the night before. He stated: "The reason I didn't holler or shout, 'Left', is that there was too much confusion then anyway. I would have just added to the confusion. Behind me is the P.A. System which interferes with both my understanding of the orders when hearing and also his; also on the bridge at that time our V.H.F. was on and there was a considerable amount of crackling and extraneous conversation from people outside the vessel which wasn't to do with the vessel at all. At the same time the Pilot had in his hands his own Walkie-Talkie which he was using to talk to the towboat Master and both his conversation and the towboat Master's conversation was audible to us at this time. That was the Docking Master, the Bar Pilot was on the Bridge at the same time and so was the 'Old Man'. Consequently, we had three people up there with something to say at sometime or another during the events." See Rominger deposition, pp. 372–374.

to loss, unless appropriate means are adopted to prevent it.' The Cleveco, 6 Cir., 1946, 154 F.2d 605, 613, 1946 AMC 933." See Avera v. Florida Towing Corporation, 322 F.2d 155, 166 (5th Cir.); also China Union Lines, Ltd. v. Andersen, *supra*, 364 F.2d at 787.

3. "In respect of loss of life or bodily injury the privity or knowledge of the master of a seagoing vessel . . . at or prior to the commencement of each voyage, should be deemed conclusively the privity or knowledge of the owner of such vessel." 46 U.S.C. § 183(e).[5]

 4. Petitioner failed to sustain its burden of proving that navigational errors which caused the collision were without its privity or knowledge.

It is therefore ordered that the complaint for limitation of liability by Farrell Lines Incorporated, owner of the S.S. "African Neptune", be denied.[6]

---

5. This Court ruled earlier that the departure of the "African Neptune" from Brunswick (via Savannah) enroute to her New York destination constituted a "voyage" within the meaning of this provision of the Limitation of Liability Act. I rejected the contention of Farrell Lines that the "voyage" commenced at Lyttleton, New Zealand.

6. As to the effect of this Order on the limitation fund and the claims and claimants, see Just v. Chambers, 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903; The Chickie, 141 F.2d 80, 84 (3rd Cir.); In Re Midland Enterprises, Inc., 296 F.Supp. 1356, 1365–1366 (S.D., Ohio).